UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANTIAGO ALVAREZ,

                    Plaintiff,

v.

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.

_____ /

Case No. No. 19-13679

District Judge Stephen J. Murphy, III

Magistrate Judge R. Steven Whalen

## REPORT AND RECOMMENDATION

Plaintiff Santiago Alvarez brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [ECF No. 19] be GRANTED and that Plaintiff's Motion for Summary Judgment [ECF No. 18] be DENIED.

## I.  PROCEDURAL HISTORY

On May 8, 2017, Plaintiff filed an application for DIB, alleging disability as of

-1-

November 29, 2015. ECF No. 11-5, PageID.175 (Tr. 141)[1].  Upon initial denial of the claim,

Plaintiff requested an administrative hearing, held on May 22, 2018 in Detroit, Michigan (Tr.

50).    Administrative  Law  Judge  ("ALJ")  Lauren  G.  Burstein  presided.    Plaintiff,

unrepresented, testified (Tr. 57-77, 83-85), as did Vocational Expert ("VE") Roxane Minkus,

Ph.D. (Tr. 56-57, 77-83).  On December 26, 2018, ALJ Burstein determined that Plaintiff was

not disabled (Tr. 39-46).

On October 9, 2019, the Appeals Council declined to review the ALJ's decision (Tr.

1-4).  Plaintiff filed suit in this Court on December 13, 2019.

## II.  BACKGROUND FACTS

Plaintiff, born November 3, 1977, was 41 at the time of the  administrative decision

(Tr. 46, 141).   He completed two years of college and worked previously as a machine

operator (Tr. 167).  He alleges disability due to lumbar disc herniation with radiculopathy of

the right leg (Tr. 166).

### A.  Plaintiff's Testimony

Plaintiff, unrepresented, offered the following testimony.

He lived with his mother in a two-story townhouse (Tr. 62).  His bedroom was on the

first floor (Tr. 62).  His mother experienced hypertension and other health problems but

Plaintiff did not help take care of her (Tr. 63).  He had an associate's degree in business (Tr.

---

[1]References to the administrative record, ECF No. 11, are henceforth cited by
administrative transcript page number "(Tr.)."

13).  He did not work (Tr. 13).  He received food stamps (Tr. 13).

Plaintiff stopped working after November 29, 2015 due to an injury (Tr. 64).  Before ceasing work, he worked as a machine operator (Tr. 65).  His work required him to stand for most of the day (Tr. 65).  He spent approximately five to eight percent of his work time using a forklift and an unspecified amount of time inspecting (Tr. 68-69).

He was unable to work due to back pain, numbness, and medication side effects (Tr. 70).  He experienced difficulty putting on socks and performing self-care chores (Tr. 70).  He had not finished a prescribed course of physical therapy due to pain and physical limitations (Tr. 70).  Due to bilateral carpal tunnel syndrome ("CTS") his arms fell asleep (Tr. 71).  He was unable to sit in an office chair or stand for more than two hours at a time but could sit for up to four hours in a "comfortable" chair (Tr. 71).  He was able to walk for up to three hours at a time (Tr. 72).  He was unable to lift anything heavier than a bag of groceries (Tr. 72).  He experienced sleep disturbances due to spasms, cramps, and pain (Tr. 72).

On a typical day, Plaintiff made breakfast, took medication, watched television, and might go to church, read, shopped with his mother, or visit friends (Tr. 73).  His mother did the cooking and laundry (Tr. 73).  He experienced the medication side effects of dizziness, drowsiness, and nausea (Tr. 73).  He was able to dress himself with difficulty (Tr. 74).  He was able to shower with the help of a ramp and handle bars, and drove (Tr. 74).  He cooked and grocery shopped occasionally (Tr. 74).  The shopping trips lasted up to three hours (Tr. 75).  He did not perform yard work (Tr. 75).  Due to nighttime sleep disturbances, he napped

for around two hours a day (Tr. 75).  He did not use alcohol or illicit drugs but smoked cigarettes occasionally (Tr. 76).

**B.  Medical Records**

### 1.  Records Related to Plaintiff's Treatment[2]

March, 2014 records by internist Albagir Alarabi, M.D. note a diagnosis of bronchitis and asthma following an overseas trip (Tr. 273).  In May, 2015, Plaintiff reported anxiety characterized by "decreased need for sleep, depressed mood, difficulty concentrating, excessive worry, and fatigue" (Tr. 289).  A review of systems was unremarkable (Tr. 292).

On December 1, 2015, Plaintiff sought urgent treatment after experiencing moderate lumbar spine pain and right leg pain/numbness for two days (Tr. 218, 306).  He denied sleep disturbances (Tr. 306).  He exhibited an antalgic gait and tenderness upon palpation (Tr. 218).  He was prescribed Norco (Tr. 219).  He was restricted for one week to lifting 20 pounds or less (Tr. 223).  An x-ray of the lumbar spine was unremarkable (Tr. 224).  An MRI of the lumbar spine from the following week showed  a right-sided disc herniation at L4-L5 with nerve root impingement and a "minimal" disc bulge at L5-S1 (Tr. 226).  Physical therapy intake records from the next month note Plaintiff's report of difficulty walking, carrying/lifting, and using stairs (Tr. 228).  The following week, Plaintiff reported level "two" out of ten pain after doing "a little shoveling" but was "otherwise fine" (Tr. 242).  Two weeks

---

[2]Records created prior to the alleged onset of disability date of November 29, 2015 are included for background purposes only.

-4-

after starting therapy Plaintiff reported "no pain" (Tr. 248, 252, 255). He demonstrated 5/5 strength in all muscle groups (Tr. 255). Discharge records from the end of the month note that Plaintiff was advised to continue stretching (Tr. 256). He demonstrated a normal gait (Tr. 327). Physical therapy records state that he could return to work without restriction in two weeks (Tr. 256). In contrast, Kais Zakharia, M.D. found that Plaintiff should not return to his former work because "herniation [would] likely recur" due to the need to work with heavy weights (Tr. 327). Pain medication was deemed unnecessary (Tr. 327).

March, 2016 treating records note that Plaintiff was "convinced that he can't do [his] work anymore" and requested a neurosurgical consult due to intermittent back pain (Tr. 329). The following month, Plaintiff requested a disability claim form and work excuse (Tr. 337). He demonstrated 4/5 strength in the right leg and a positive straight leg test (Tr. 340).

In March, 2016, neurosurgeon Mick Perez-Cruet, M.D. noted Plaintiff's report that right leg pain preventing him from working, showering, and exercising (Tr. 260). Plaintiff reported that he took Naproxen and Hydrocodone level for level "four" pain (Tr. 268, 271).

In October, 2017, Plaintiff exhibited normal movement in all extremities (Tr. 390). A November, 2017 MRI of the lumbar spine showed "very mild" disc space narrowing at L4-L5 (Tr. 355, 372, 421). The same month, Plaintiff exhibited a normal gait and full muscle strength (Tr. 375). He was advised against lumbar spine surgery, but was advised to undergo steroid injections (Tr. 375). Records from the next month note prescriptions for Flexeril, Ultram, and Neurontin (Tr. 454). Range of cervical and lumbar spine motion was

unremarkable with negative bilateral straight leg testing (Tr. 456).

A March, 2018 epidural steroid injection was performed without complications (Tr. 351, 446). An MRI from the following month showed moderate stenosis at L4-L5 without nerve root involvement (Tr. 355). EMG studies of the upper extremities performed the same month showed "mild, chronic bilateral radiculopathy" (Tr. 359, 488). The same month, Plaintiff exhibited a normal gait and full muscle strength (Tr. 375). He was advised to restrict his back care to conservative treatment and perform stretching exercises (Tr. 375, 460). An MRI of the cervical spine from May, 2018 showed mild ventral cord deformities at C4-C5, C5-C6, and C6-C7 without cord signal abnormality (Tr. 361, 423, 450). A neurological examination of the bilateral wrists was unremarkable (Tr. 464). June, 2018 records note that Plaintiff appeared healthy but used a cane and demonstrated a positive straight leg raise test on right (Tr. 410). He underwent cervical and lumbar spine injections to reduce symptoms of radiculopathy (Tr. 492, 500). In August, 2018, Plaintiff reported that he was scheduled for an injection to address upper extremity symptoms (Tr. 482).

## 2. Non-Treating Records

In August, 2017, Moises Alviar, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of chronic "sharp" radiating low back pain (Tr. 343). Plaintiff reported that he had not followed up on recommendations for steroid injections and surgery due to losing his medical insurance in March, 2016 (Tr. 343). He exhibited an "occasional limp," "some unsteadiness" on the right with heel and toe walking, and a

decreased range of lumbar spine motion (Tr. 344, 348). All other systems were normal (Tr. 344). In September, 2017, Twaide Langham, D.O. performed a non-examining assessment based on the treating and consultative records, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, and walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 93). Dr. Langham found that Plaintiff was limited to occasional postural activity (Tr. 94).

### 3. Records Submitted After the ALJ's December 26, 2018 Decision[3] (Tr. 9-35)

In April, 2019, Plaintiff underwent a lumbar steroid injection (Tr. 16). Plaintiff was advised to perform home exercises, engage in physical therapy, receive injections, and take medication to alleviate cervical spine-related symptoms (Tr. 21-26).

### C. Vocational Testimony

The VE classified Plaintiff's past work as a machine operator as skilled and exertionally medium as described by the *Dictionary of Occupational Titles* ("*DOT*") but exertionally heavy as actually performed[4] (Tr. 57, 78). The ALJ then posed the following set

---

[3]

A review of these records that the shows that they pertain to Plaintiff's condition well after the ALJ's December 26, 2018 determination. Plaintiff's condition subsequent to the non-disability determination is intrinsically irrelevant to whether he became disabled on or before the date of the ALJ's determination. *See Sizemore v. Secretary of HHS*, 865 F.2d 709, 711 (6th Cir. 1988). If Plaintiff believes his condition has worsened subsequent to the December 26, 2018 determination, the proper remedy is to file a new application for benefits. *Id.*

[4]

20 C.F.R. §§ 404.1567(a-d); 416.967(a-d) define *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting

of limitations to the VE, describing a hypothetical individual of Plaintiff's age, educational level, and work history:

> [A]ssume that this individual is limited to light work, can climb ramps and stairs occasionally, can never climb ladders, ropes and scaffolds, can balance, stoop, kneel, crouch and crawl occasionally. Can this individual perform any of the claimant's past work? (Tr. 78-79).

The VE testified that the above limitations precluded Plaintiff's past work but allowed for unskilled, exertionally light work of a cashier (at least 330,000 positions in the national economy); fast food worker (785,000); and housekeeper (168,000) (Tr. 79). The VE stated further that if the same individual also required a sit/stand option allowing him to change position every two hours for 15 minutes at a time, the job findings would remain unchanged (Tr. 80). The VE testified that if the same individual were limited to sedentary work, he could perform the jobs of cashier (sedentary) (81,000); telephone solicitor (123,000); and surveillance system monitor (32,000) (Tr. 82). She stated that if the individual were off task 20 percent or more of the workday due to pain or medication side effects, all competitive work would be eliminated (Tr. 82).

### D. The ALJ's Determination

---

or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

Citing the medical transcript, ALJ Burstein found that Plaintiff experienced the severe impairments of "lumbar disc herniation; degenerative disc disease; and mild carpal tunnel syndrome" but that none of the conditions met or equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 42).

ALJ Burstein determined that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional restrictions:

> [L]imited to occasionally climbing ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and would require a sit/stand option, sitting for up to two hours at a time and standing for up to two hours at a time (Tr. 42).

Citing the VE's testimony (Tr. 79), the ALJ determined that Plaintiff could work as a cashier, fast food worker, and housekeeper (Tr. 45-46).

The ALJ discounted Plaintiff's allegations of disability (Tr. 22-23).   She cited Plaintiff's testimony that he could sit for up to two hours in an office chair, stand for two hours, and walk for three (Tr. 44).  She noted further that Plaintiff's regular activities also undermined the disability claim, noting he was able to care for his personal needs,  shop, and attend church services regularly (Tr. 44).   The ALJ cited the clinical testing and imaging studies supporting the non-disability determination (Tr. 43-44).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation

altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).   The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.   *Biestek* at 139 S. Ct. at 1152; 42 U.S.C. §405(g).   "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(*en banc*).  Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391–92 (6th Cir. 1999).

## V.  ANALYSIS

Plaintiff, proceeding *pro se,* makes two arguments for remand.[5]  ECF No. 18.  First, he contends that the RFC for a range of light work is not supported by the VE's testimony. *Plaintiff's Brief,* ECF No.18, PageID.584.  He argues second that the ALJ erred by declining

---

[5]Plaintiff's brief includes "NOTICE OF LIMITED SCOPE OF ASSISTANCE" by the Detroit Mercy Law Pro Se Legal Assistance Clinic. ECF No.18, PageID.579, fn 2.

to order a consultative psychological examination to address his allegations of depression and anxiety and more generally, failed to develop the record as to his psychological problems. *Id.* at 590.

### A.  The Vocational Testimony

Plaintiff contends that the Residual Functional Capacity ("RFC") for a limited range of light work set forth in the administrative decision is not supported by the VE's testimony. *Id.* at 584.  Specifically, Plaintiff claims that the RFC's statement that he would require a sit/stand option allowing him to change positions every two hours is contradicted by the VE's testimony that if the hypothetical individual "had to" sit for two hours for every eight-hour work period, he would be unable to perform the work of a cashier, fast food worker, or cleaner. *Id.* at 586 (*citing* Tr. 45-46, 80).

 It is well settled that "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v Commr of Soc Sec*, 594 F3d 504, 516 (6th Cir. 2010).  In cases such as here where the claimant experiences non-exertional limitations, the finding that he can perform other work must be supported by vocational testimony. *See Teverbaugh v. Comm'r of Soc. Sec.*, 88 Soc Sec Rep Serv 317; 258 F Supp 2d 702, 706 (E.D. Mich, 2003)(Roberts, J.))("Because the VE's [incomplete] testimony was the only step five evidence that the ALJ relied upon, the Court cannot rule that there is substantial evidence to support the

ALJ's findings").  For the same reasons, adopting a VE's job findings in support an RFC

containing more restrictive modifiers than those found in the hypothetical question forming

the basis of the VE's job findings constitutes reversible error. *Id.* (*citing Steward v. Barnhart*,

44 Fed. Appx. 151 (9th Cir. August 5, 2002)("Reversible error for ALJ to rely upon jobs listed

by VE that required transferable skills, where the ALJ ultimately found that the claimant did

not have transferable skills").  For example, a VE's testimony that a claimant could perform

the light work of a packager  and laundry worker (given in response to the hypothetical

modifier of exertionally light work)  cannot be used to support a Step Five non-disability

finding if the ALJ ultimately finds that the claimant is limited to sedentary work.

However, Plaintiff's Step Five arguments are inapplicable here.  The ALJ's

hypothetical modifiers described an individual who was capable of both sitting *or*

stand/walking for up to two hours at a time (Tr. 80).  The modifiers appear to be based on

Plaintiff's own testimony that  he could sit in an office chair or stand for up to two hours at

a time and walk for three hours at a time (Tr. 71-72).  In response, the VE cautioned that the

*need* to sit for two hours would eliminate all three of her "light work" job findings but noted

that if the individual  could "be on [his] feet" for up to two hours, he could change positions

during the customary work 15-minute work breaks occurring every two hours (Tr. 80).  The

ALJ then clarified that while the individual was unable to sit for more than two hours at a

stretch, he was not *limited*  to work allowing him to sit for two hours (Tr. 80).  Following the

ALJ's clarification, the VE concluded by stating that she did not "see an issue with [the]

hypothetical [for light work]" (Tr. 80).   In other words, the ALJ's modifiers, found both in the hypothetical question and RFC, were consistent with the VE's exertionally light job findings.  Plaintiff's contention that the RFC indicating that he was *capable* of either sitting or standing for up to two hours at a time should be read that he *must* sit for two hours at a time reflects an erroneous reading of the VE's testimony and RFC[6] (Tr. 42).

The hypothetical modifiers and RFC are also well supported by the record.  It bears repeating that the finding that Plaintiff could stand for two hours is based on his own testimony.  *See* SSR 83-10, 1983 WL 31251, at *6 (January 1, 1983)("full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday").  The RFC's requirement of a position change after standing for two hours likewise reflects Plaintiff's self-described exertional abilities (Tr. 42).  Plaintiff's argument that he is incapable of the modified range of light work is stands at odds with his sworn testimony, the generally weak support for disability found in the medical transcript, and Dr. Langham's finding that he was capable of light work (Tr.  93),

Further, even assuming that the evidence overwhelmingly pointed to the conclusion that Plaintiff was limited to sedentary work requiring no more than two hours of standing or walking in an eight-hour day (with a change of position allowed every two hours), the VE

---

[6]
The ALJ found that Plaintiff could stand for two hours at a stretch and otherwise perform the requirements of exertionally light work (Tr. 42).  Given that he would be allowed a customary work break of 15 minutes every two hours, her finding that he needed a sit/stand option allowing for a position change every two hours is redundant.  Plaintiff's confusion on this point is somewhat understandable.

testified that the non-exertional hypothetical limitations, coupled with a restriction to sedentary work, would also allow for a significant number of sedentary positions (Tr. 81). *See* SSR 83-10 at *6 (For sedentary work, "periods of standing or walking should generally total no more than about two hours of an eight-hour workday, and sitting should generally total approximately six hours of an eight-hour workday"). Thus, a finding that the Plaintiff was limited to only sedentary work would not change the non-disability finding.

### B. The ALJ's "Heightened Duty"

Plaintiff, unrepresented at the administrative level, also argues that the ALJ failed her "heightened duty" to develop the record where the claimant is *pro se*. ECF No.18, PageID.590. He contends he "lacked the resources and sophistication necessary to present an effective case at his hearing." *Id.* at 591. He also argues further that the ALJ "failed to consider the underlying materials [he] relied upon" in his "eventual successful claim for state disability benefits" *Id.* at 592 and erred by declining "to ask whether he had an on-going case for state disability." *Id.* at 593. Finally, he contends that the ALJ "failed to develop the record pertaining to [his] allegations of anxiety" by declining to order a mental status examination. *Id.* (*citing* 20 C.F.R. § 404.1545(a).

As a threshold matter, Plaintiff's *pro se* status, without more, does not establish that the ALJ had a "heightened duty" to develop the record. An ALJ has a heightened duty to develop the administrative record "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, *and* (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc.*

*Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008)(emphasis added)(*citing Lashley v. HHS*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)).  In *Wilson,* the Court rejected  the plaintiff's claim that her *pro se* status triggered a heighten duty to develop the record.  In distinguishing *Lashley,* the Court noted that Mr. Lashley "was a 79 year-old with a fifth grade education, who after suffering two strokes had trouble reading, writing, and reasoning" and that "the ALJ conducted a superficial examination that failed to heed the claimant's obvious confusion and inability to effectively present his case." *Id.* (*citing Lashley* at 1049, 1052).

Unlike the claimant in *Lashley*, Plaintiff cannot show that he was incapable of presenting an effective case or was unfamiliar with the relevant hearing procedures.  After being informed of his right to representation, Plaintiff chose to proceed unrepresented (Tr. 52). He reported that he examined his submitted medical files before the hearing and was convinced that all of the relevant records were included (Tr. 54-55).  The ALJ questioned Plaintiff at length as to the submitted records (Tr. 57-63) and as a safeguard, ordered copies "all the Henry Ford records" (Tr. 62).  Indeed, the medical transcript contains multiple copies of a number of records suggesting that the ALJ was overcareful in ensuring that she had a complete picture of Plaintiff's condition.

The hearing transcript does not show that the ALJ's questioning was perfunctory or that Plaintiff was unable to provide cogent testimony. The ALJ inquired into his living situation, regular activities, medication side effects, and functional limitations (Tr. 62, 70-76).  Plaintiff, a high school graduate with two years of college, provides no support for his claim that he

-16-

lacked the sophistication or communication skills necessary to testify to his limitations. The ALJ began her questioning by asking Plaintiff what he believed prevented him from working, to which Plaintiff stated that he was limited by pain, numbness, and medication side effects (Tr. 70). Before proceeding with the VE's testimony, Plaintiff was asked if he had "anything else" that he believed the ALJ needed to know to which he replied, "No, I believe that's pretty much it" (Tr. 76). While Plaintiff notes that he was uncertain as to whether the ALJ would make a determination at the hearing or he would receive notice later by mail (Tr. 83), he does not explain how his lack of knowledge on this point compromised his ability to make his case.

Plaintiff's related argument that the ALJ ought to have inferred that he was making a claim for state disability benefits based on his testimony that he received food stamp assistance is without merit (Tr. 63). "The ALJ's duty to develop the record does not extend to reading a claimant's mind regarding issues [the claimant] may think are material to the outcome." *Lund v Colvin*, 2014 WL 1153508, at *30 (D. Minn. March 21, 2014). Without more, Plaintiff's statement that he received food stamps does not place the ALJ on notice that he was making a claim for state disability benefits. Further, assuming that Plaintiff actually testified that he had applied for the state benefit program, the ALJ was not required to consider the application in weighing the evidence. Plaintiff cites 20 C.F.R. § 404.1504, which states that the ALJ must "consider all of the supporting evidence underlying [another] governmental agency or nongovernmental entity's decision." However, he admits that at the time of the ALJ's determination, he had not yet been awarded the state benefits. Plaintiff's assignment of error

-17-

based on ALJ's "failure" to consider the evidence used in making a non-existent decision does not provide grounds for remand.

For overlapping reasons, Plaintiff's claim that the ALJ ignored the references to anxiety in the treating records and failed to develop the records as to his psychological condition should be rejected.  While Plaintiff reported symptoms of anxiety to a treating source (Tr. 289), his report predates the alleged onset of disability date by several months.   Plaintiff does not list anxiety, depression, or any other psychological condition in his application for benefits (166, 185).  He did not allege anxiety or depression in his report of daily activities (Tr. 174-180).  He did not testify that his activities were impeded even slightly by psychological issues although the ALJ twice encouraged him testify to anything that he believed was related to the disability claim (Tr. 70, 83).   The medical transcript does not include mental health counseling or psychiatric records. Although records created before the relevant period (while Plaintiff was working)  note his report of anxiety, none of the treating records from the period under consideration suggest that anxiety caused a significant degree of work-related limitation. "Absent . . . special circumstances . . . this court repeatedly affirms that the claimant bears the ultimate burden of proving disability." *Wilson,* 280 Fed. Appx. at 459.  Notably, while Plaintiff contends that ALJ failed to consider "all of the relevant medical and other evidence" in crafting the RFC as required by 20 C.F.R. 404.1545(a)(3), the next sentence of the same regulation states that the claimant is "responsible for providing the evidence" used in making a finding. Plaintiff provided no testimony, much less medical evidence for the relevant period to support

his present argument that he experienced significant psychological limitation. *See Tina L. P. v Comm'r of Soc. Sec.*, 2020 WL 5548864, at *8 (S.D. Ill. September 16, 2020)(rejecting claimant's argument that the ALJ erred by failing to address a claim unraised at the administrative level: "the ALJ gave Plaintiff the floor to openly speak of anything regarding her impairments and disability application. . . . If the Court accepted Plaintiff's argument, that would force the ALJ to read Plaintiff's mind. In short, the ALJ is not required to be a clairvoyant").

Further, the ALJ did not err in declining to order a psychological consultative examination given that Plaintiff did not provide even a hint that his disability claim was based on a psychological limitation.   Under 20 C.F.R. § 404.1519a(b), the decision to order a consultative examination is within the ALJ's discretion.   "Situations that may require a consultative examination" include resolving "an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on [the] claim." Plaintiff's failure to allege or demonstrate any significant psychological limitation for the relevant period defeats his claim that a psychological evaluation was necessary to adjudicate the DIB claim.

Aside from Plaintiff's discrete arguments for remand, substantial evidence supports the ALJ's non-disability determination.   Physical therapy intake records made within two months of the November, 2015 disc herniation show that Plaintiff no longer experienced pain, had a normal gait, and demonstrated full muscle strength (Tr. 248, 252, 255).  An MRI of the lumbar

-19-

spine made within one year after the alleged onset of disability show that the herniation at L4-L5 had largely resolved and that Plaintiff exhibited a normal gait with full muscle strength (Tr. 355, 372, 421). Medical records from the same period show that only conservative treatment was recommended (Tr. 375). Dr. Langham's September, 2017 finding that Plaintiff could perform exertionally light work limited to occasional postural activity further supports the RFC and ultimate finding of non-disability (Tr. 93-94).

In closing, my recommendation to uphold the administrative findings should not be read to trivialize Plaintiff's allegations or the evidence that he experiences some degree of limitation. Nonetheless, because the ALJ's determination that he is not disabled is comfortably within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen, supra*.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [ECF No. 19] be GRANTED and that Plaintiff's Motion for Summary Judgment [ECF No. 18] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of

objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. Steven Whalen
United States Magistrate Judge

Dated: January 27, 2021

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 27, 2021 electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager